**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE**


Kevin Thurlow

      v.                                                    Civil No. 16-cv-512-SM

Warden, New Hampshire State Prison


**REPORT AND RECOMMENDATION**


Petitioner Kevin Thurlow, a prisoner in the custody of the New Hampshire Department of Corrections, has filed a petition for a writ of habeas corpus (Doc. No. 1) pursuant to 28 U.S.C. § 2254.  Before the undersigned magistrate judge for a report and recommendation are the parties' cross-motions for summary judgment (Doc. Nos. 24, 26).  See Apr. 2, 2019 Notice; LR 72.1.  Both motions are duly opposed.  See Doc. Nos. 25, 27.


**Background**

Thurlow is currently serving a 43-86-year prison sentence, pursuant to his convictions for six felony sexual assault offenses and three manufacturing child pornography offenses.  See Nov. 28, 2012 Mittimuses, State v. Thurlow, No. 281-2010-CR-1686 (N.H. Super. Ct., Rockingham Cty.) ("State Criminal Case"); Def.'s Brief, State v. Thurlow, No. 2012-0935 (N.H. May 28, 2013), at 10-30.  Thurlow's convictions were for offenses he

1

committed in 2004 against his (then) stepdaughter, L.G.  See
State v. Thurlow, No. 2012-0935, ("Criminal Appeal"), 2014 N.H.
LEXIS 32, at *2, 2014 WL 11621685, at *1 (N.H. Feb. 26, 2014).
The record in this case reveals the following facts.

Thurlow married L.G.'s mother, Linda Daigle, in 2001, when
L.G. was five years old.  At the time, Daigle had two children,
L.G. and an eight-year-old son, A.G.  When Thurlow engaged in
the conduct for which he was convicted, he lived in Epping, New
Hampshire with Daigle, A.G., L.G., and Thurlow's two sons, one
from a previous relationship, and one born to Daigle.  Until
2008, when Thurlow's offenses came to light, A.G. and L.G. spent
the school year with Daigle and Thurlow in Epping, and spent
summers in Vermont with their father.

Thurlow sexually assaulted L.G. at  their house, on more
than one occasion, before and while L.G. was in the second,
third, and fourth grade.  When L.G. was 11 or 12 years old,
Thurlow told her that he wanted to take pictures of her in a
bathing suit.  She agreed, and posed for Thurlow, wearing a
bathing suit.  After taking a number of photographs, Thurlow
directed L.G. to move her bathing suit to the side to expose her
genitals and breasts.  She did so, and Thurlow took photographs
in which L.G.'s genitals and breasts were exposed.

In July 2008, after L.G. and her brother had left Epping to
spend the summer with their father in Vermont, Daigle searched

Thurlow's computer and discovered twenty-four of the above-described photographs of L.G. in a blue bathing suit.  Daigle went to the police with the photographs she had found, and officers went to the Thurlow/Daigle residence to investigate. The police arrested Thurlow on unrelated charges, and confiscated Thurlow's computer.

Later that month, in response to the discovery of the blue bathing suit photographs of L.G. on Thurlow's computer, L.G. was interviewed at the Child Advocacy Center ("CAC").  When asked whether Thurlow had ever touched her in a sexual way, she said that she did not know, or could not remember.[1]  After her CAC interview, L.G. began seeing a counselor, who kept records of her sessions with L.G.  In April 2010, L.G. gave a second interview at the CAC in which she disclosed sexual contact with Thurlow.  As a result of what L.G. said in her CAC interviews, the State charged Thurlow with felony sexual assault and manufacturing child sexual abuse images.

With respect to the manufacturing child sexual abuse image charges, the indictments specified that "Thurlow took pictures of L.G. . . . in a blue bathing suit while there was a lewd exhibition of L.G.'s genitals."  May 28, 2013 Def.'s Br., at 7-

---

[1]While the record is not entirely clear on this point, it appears that L.G. told the CAC interviewer that Thurlow had taken the photographs of her in a blue bathing suit that were found on his computer.

9, Criminal Appeal.  Thurlow was also indicted on four counts of manufacturing child sexual abuse images of L.G. while she was wearing a black bathing suit, but the State later nol prossed those charges.  See Trial Tr., vol. I, 44:21-22, State Criminal Case.

In the meantime, on February 22, 2012, Thurlow was indicted in this court on federal child pornography charges.  See Feb. 22, 2012 Indictment, United States v. Thurlow, No. 1:12-cr-027-PB-1 (D.N.H.) ("Federal Criminal Case") (ECF No. 1).  In his federal case, he was represented by Attorney Jonathan Saxe.  See Feb. 24, 2012 Order, Federal Criminal Case (ECF No. 5).  On occasion, Attorney Saxe provided information and made suggestions to the Attorney Deanna Campbell, who represented Thurlow in the state criminal proceedings.

In June 2010, during the course of his state-court prosecution, Thurlow moved the trial court to remove and replace Attorney Campbell.  The trial court never ruled on Thurlow's motion.  Thurlow was tried in state court in September 2012, with Attorney Campbell serving as his counsel.  Thurlow was convicted on all of the charges on which he was tried.  See Sept. 19, 2012 Order, State Criminal Case.  The New Hampshire Supreme Court ("NHSC") affirmed his convictions.  See Criminal Appeal, 2014 N.H. LEXIS 32, at *2, 2014 WL 11621685, at *1 (N.H. Feb. 26, 2014).

On June 23, 2014, Thurlow filed a pro se motion for a new trial in the Superior Court, arguing that: (1) his trial counsel made two errors that deprived him of his right to the effective assistance of counsel; and (2) the trial court erred by ignoring his request to fire Attorney Campbell.  See June 23, 2014 Mot. for New Trial, State Criminal Case (Doc. No. 1-1, at 2).  The Superior Court denied both Thurlow's motion for a new trial, see July 6, 2016 Order, id. ("MNT Order") at 27 (Doc. No. 1-1, at 38), and a motion for reconsideration that was filed by counsel appointed to represent Thurlow in his post-conviction proceedings.  See July 27, 2016 Order, id. (Doc. No. 1-1, at 47) (denying July 15, 2016 Def.'s Mot. for Recons., id. (Doc. No. 1-1, at 39)).  The NHSC declined Thurlow's notice of discretionary appeal.  See State v. Thurlow, No. 2016-0460 (N.H. Sept. 28, 2016) (Doc. No. 1-1, at 61).

## 28 U.S.C. § 2254 Standard

A federal court may grant a petition for a writ of habeas corpus "only on the ground that [a petitioner] is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).  When a prisoner brings a claim in federal court that "was adjudicated on the merits in State court proceedings," under 28 U.S.C. § 2254(d),

> [f]ederal habeas relief may not be granted . . .
> unless it is shown that the earlier state court's
> decision "was contrary to" federal law then clearly
> established in the holdings of this Court; or that it
> "involved an unreasonable application of" such law; or
> that it "was based on an unreasonable determination of
> the facts" in light of the record before the state
> court.

Harrington v. Richter, 562 U.S. 86, 100 (2011) (citations
omitted).  As to the distinction between decisions that are
contrary to federal law and those that involve an unreasonable
application of such law, the Supreme Court has explained:

> Under the "contrary to" clause, a federal habeas court
> may grant the writ if the state court arrives at a
> conclusion opposite to that reached by this Court on a
> question of law or if the state court decides a case
> differently than this Court has on a set of materially
> indistinguishable facts.  Under the "unreasonable
> application" clause, a federal habeas court may grant
> the writ if the state court identifies the correct
> governing legal principle from this Court's decisions
> but unreasonably applies that principle to the facts
> of the prisoner's case.

Williams v. Taylor, 529 U.S. 362, 412-13 (2000).


## Discussion

Thurlow asserts three claims for relief under the Sixth
Amendment to the United States Constitution.  Thurlow claims
that he was denied the effective assistance of trial counsel in
two ways and that the trial court violated his Sixth Amendment
rights by failing to rule on his request to fire Attorney
Campbell.

I.    Ineffective Assistance of Counsel Claims

    A.    Legal Standard

The Sixth Amendment, which is made applicable to the states by the Fourteenth Amendment,[2] guarantees a criminal defendant "the right to the effective assistance of counsel." United States v. Miller, 911 F.3d 638, 641 (1st Cir. 2018) (quoting Strickland v. Washington, 466 U.S. 668, 686 (1984)). To assert an ineffective assistance of counsel claim, "[f]irst, the defendant must show that counsel's performance was deficient," and "[s]econd, the defendant must show that the deficient performance prejudiced the defense." Strickland, 466 U.S. at 687.

To satisfy the first part of the inquiry, the so-called performance prong, Thurlow must show that Attorney Campbell's representation was "outside the wide range of professionally competent assistance." Id. at 690. To satisfy the prejudice prong, Thurlow must show "that 'there is a reasonable probability that, but for [Attorney Campbell]'s unprofessional errors, the result of the proceeding would have been different.'" Rivera v. Thompson, 879 F.3d 7, 12 (1st Cir. 2018) (quoting Strickland, 466 U.S. at 688).

---

[2] See Walker v. Medeiros, 911 F.3d 629, 631 n.1 (1st Cir. 2018).

When reviewing an ineffective assistance claim asserted in a § 2254 petition, the court must apply a "doubly deferential" standard of review, which requires the petitioner "to show that counsel's performance was objectively unreasonable and that no reasonable jurist could come to the . . . conclusion the state court drew [that counsel's performance was reasonable]." Lucien v. Spencer, 871 F.3d 117, 131 (1st Cir. 2017) (emphasis in the original) (citing Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)); see also Rivera, 879 F.3d at 12. This "'doubly deferential standard of review [which] gives both the state court and the defense attorney the benefit of the doubt . . . is an extremely difficult standard to meet.'" Jaynes v. Mitchell, 824 F.3d 187, 196 (1st Cir. 2016) (citation omitted).

B.    Claim 1 – Testimony of Damon Carroll

In Claim 1, Thurlow asserts that he is being incarcerated in violation of his right to the effective assistance of counsel because Attorney Campbell "failed to interview, or call at trial, a witness, Damon Carroll, who [she] knew to possess exculpatory evidence to which Carroll would testify at trial." Feb. 1, 2017 Order (Doc. No. 3), at 1. Here, as in his motion for new trial filed in the trial court, Thurlow asserts that Attorney Saxe told Attorney Campbell that a witness, Damon Carroll, could testify that "[Carroll] had accidentally walked

in on L.G.'s brother [A.G.] taking pictures of [L.G.] in a
bathing suit." Oct. 21, 2016 Mot. for New Trial, at 2, <u>State</u>
<u>Criminal Case</u> (Doc. No. <u>1-1</u>, at 3). The Superior Court held an
evidentiary hearing on Thurlow's motion for a new trial, at
which Attorney Saxe testified as follows:

> [T]he Defendant and Mr. Carroll had been out for a
> motorcycle ride. They returned to the
> [Thurlow/Daigle] residence and they saw kind of a
> sketchy situation involving the two children where the
> male child had a camera and the female child was in, I
> think, a black bathing suit. There was a couple
> different suits. I can't remember which one.

Apr. 26, 2016 Mot. Hr'g Tr. 18:12-17, <u>State Criminal Case</u>. In
Thurlow's view, "Mr. Carroll's information would have assisted
the defense in establishing that someone other than [Thurlow]
may have taken the pictures found on the home computer." Oct.
21, 2016 Mot. for New Trial, at 2, <u>State Criminal Case</u> (Doc. No.
<u>1-1</u>, at 3. Thurlow argues that, had Carroll so testified, his
testimony would have been compelling evidence that Thurlow did
not take any pictures of L.G. in a bathing suit. Therefore,
Thurlow further reasons, his trial counsel would have been able
to make a stronger argument that Thurlow was not guilty of
sexually assaulting L.G. On that basis, Thurlow claims that
Attorney Campbell should have done more to ensure Mr. Carroll's
appearance and testimony at Thurlow's trial.

    Attorney Campbell Attorney Campbell gave a deposition in
which she explained that she did not take additional action to

ensures Mr. Carroll's appearance and testimony.  Attorney
Campbell stated at her deposition that: (1) she spoke with
Carroll once by telephone; (2) she attempted to follow up with
him repeatedly, but he did not return any of her subsequent
telephone calls; and (3) she did not take more aggressive steps
to contact Carroll because she believed he did want to talk with
her.

In its order denying Thurlow's motion for a new trial, the
Superior Court ruled that Thurlow had failed to satisfy the
performance prong of his ineffective assistance claim concerning
Attorney Campbell's failure to call Carroll as a witness at
Thurlow's trial, and that, even if Thurlow had established
deficient performance, he had not satisfied the prejudice prong.
Because the NHSC declined to review the Superior Court's order
denying Thurlow's motion for a new trial, the Superior Court
order was "'the last reasoned decision' issued by the [state
courts]," and thus this court "'look[s] through to'" that
decision in determining whether Thurlow has satisfied the § 2254
standard as to the question of whether Attorney Campbell's
failure to call Carroll as a witness amounted to the ineffective
assistance of counsel. Moore v. Dickhaut, 842 F.3d 97, 100 (1st
Cir. 2016) (citation omitted).  Therefore, the question before
this court is whether the Superior Court's  "'application of the
Strickland standard was unreasonable,'" in its order denying

Thurlow's motion for a new trial.  Hensley v. Roden, 755 F.3d
724, 736 (1st Cir. 2014) (quoting Harrington, 562 U.S. at 101).
Judge Wageling did not unreasonably apply either the performance
prong or the prejudice prong of the Strickland standard.

      A.   Performance

    Thurlow claims that the Superior Court unreasonably applied
the performance prong of the Strickland standard by ruling that
Attorney Campbell did not step "outside the wide range of
professionally competent assistance," Miller, 911 F. 3d at 641,
in deciding not to put Carroll on the witness stand at Thurlow's
trial.  With regard to calling witnesses at trial, "'[t]he
decision whether to call a particular witness is almost always
strategic.'"  Hensley, 755 F.3d at 737 (citation omitted).
"[S]trategic choices made after thorough investigation of law
and facts relevant to plausible options are virtually
unchallengeable."  Strickland, 466 U.S. at 690.

    In evaluating the performance prong of the Strickland
analysis here, the Superior Court noted the wide latitude that
attorneys have when making strategic decisions, and then stated
that "Attorney Campbell's decision not to aggressively pursue a
reluctant potential witness is exactly the type of strategic
decision that must be 'afford[ed] a high degree of deference.'"
MNT Order at 8 (Doc. No. 1-1, at 19) (citation omitted).  The

Superior Court further found that "a reasonable attorney would be concerned that Carroll's refusal to return messages meant that he was not interested in providing favorable testimony to the defense." Id. at 8-9 (Doc. No. 1-1, at 19-20). Furthermore, Attorney. Campbell provided an explanation for her decisions concerning Carroll which the Superior Court accepted, and that easily survive the doubly deferential standard that this court must apply when reviewing that court's application of Strickland's performance prong to Attorney Campbell's strategic decisions. The court finds there is no basis for rejecting the Superior Court's determination that Thurlow failed to establish that Attorney Campbell's performance was deficient, and Thurlow's claim so stating may be denied on that basis.

### B. Prejudice

Even if the Superior Court had erred in its application of the Strickland performance prong as to Claim 1, however, Thurlow has not shown that that court unreasonably applied the prejudice prong.

> To succeed on the prejudice prong, it is not enough for [a defendant] to show that the errors had some conceivable effect on the outcome, but he is also not required to prove that the errors were more likely than not to have affected the verdict. Instead, [a] reasonable probability is one sufficient to undermine confidence in the outcome. In essence, the prejudice inquiry is focused on the fundamental fairness of the proceeding.

Rivera, 879 F.3d at 12 (internal quotation marks and citations omitted).

In deciding that Thurlow had not established the prejudice prong of the Strickland standard, the Superior Court stated:

> Even if the Court assumes [that Attorney Campbell found Carroll, that Carroll cooperated with the defense, and credibly testified consistently with Attorney Saxe's representations, Thurlow] still cannot prevail on his ineffective assistance claim because Carroll's testimony would not have changed the outcome of the trial. On the contrary, it may have increased Defendant's likelihood of conviction by opening the door to otherwise inadmissible propensity evidence.

MNT Order at 9 (Doc. No. 1-1, at 20).

As for the unhelpfulness of Carroll's testimony, the Superior Court explained that while Carroll would have testified that he saw A.G. take pictures of L.G. in a black bathing suit, Thurlow was convicted of taking lewd photographs of L.G. while she was wearing a blue bathing suit. Evidence that someone other than Thurlow took pictures of L.G. in a black bathing suit does little if anything to exculpate Thurlow from charges that he took photographs of her in a blue one.

As for the potentially damaging effects of Carroll's testimony, the Superior Court noted that: (1) Carroll testified to seeing A.G. take pictures of L.G. in a black bathing suit; (2) the State nol prossed the four indictments charging Thurlow with taking photographs of L.G. in a black bathing suit; and (3)

Attorney Campbell successfully moved to keep the jury from

seeing the photographs of L.G. in a black bathing suit which

were found on Thurlow's computer.

> Carroll's testimony relates solely to charges which
> the State nolle prossed before trial and which
> Attorney Campbell successfully kept the jury from
> learning about.  Had Carroll testified at trial, his
> testimony would have introduced this otherwise
> inadmissible evidence to the jury.  In effect, the
> jury would have learned that Defendant had two sets of
> inappropriate pictures of the victim on his computer,
> only one of which could potentially be explained by
> Carroll's testimony, if the jury found him credible.
> In sum, Carroll's testimony would have hurt, not
> helped, Defendant, and thus he cannot demonstrate any
> prejudice resulting from Attorney Campbell's failure
> to pursue Campbell as a defense witness.

MNT Order at 10 (Doc. No. 1-1, at 21).  In other words, the

Superior Court found that Carroll's testimony concerning the

photographs of L.G. in a black bathing suit would have been, at

best, a double-edged sword, and that Attorney Campbell was

appropriately concerned with mitigating the potential for such

testimony to prejudice Thurlow's defense.

Thurlow asserts that: (1) the rationale the Superior Court

relied on "was never articulated or advanced by trial counsel in

her deposition or at any point in the proceedings," Mar. 14,

2019 Pet'r's Mem. of Law (Doc. No. 25-1, at 8); and (2) that the

Superior Court's "ruling was 'based on an unreasonable

determination of the facts in light of the evidence presented in

the state court proceeding," id. (quoting Teti v. Bender, 507

F.3d 50, 56 (1st Cir. 2007); citing 28 U.S.C. § 2254(d)(2)).
Thurlow identifies no authority, however, and the court is aware
of none, for the proposition that when assessing the degree of
prejudice that resulted from Attorney Campbell's litigation
strategy, the Superior Court was limited to theories that
Attorney Campbell advanced in her deposition, or that the
Superior Court was limited to Attorney Campbell's testimony in
determining the facts upon which to rest its decision.

Lastly, Thurlow claims that the absence of Carroll's
testimony was a serious enough evidentiary defect to undermine
confidence in the jury's verdict.  First, evidence that A.G.
took pictures of L.G. in a black bathing suit is weak evidence
that Thurlow did not take photographs of her in a blue bathing
suit, or that Thurlow did not sexually assault L.G.  Next, as
explained above, it is not the province of this court to make
its own finding as to whether Attorney Campbell's representation
was ineffective under the Strickland standard.  The question
before this court is whether the Superior Court rendered a
decision that was contrary to or an unreasonable application of
Strickland when that court ruled that Attorney Campbell did not
provide ineffective assistance of counsel to Thurlow.  As
already explained, the Superior Court did not unreasonably apply
the Strickland standard in making the ruling Thurlow challenges
here through Claim 1.

II.  Claim 2 – L.G.'s Mental Health Records

Beginning in July 2008, L.G. saw a counselor for about a year and a half.  At some point, Attorney Saxe saw some of L.G.'s counseling records, told Attorney Campbell that he had seen them, and suggested to Attorney Campbell that those records might be useful to her defense of Thurlow in state court. Attorney Campbell, however, did not try to obtain or examine L.G.'s counseling records.  Thurlow's second ineffective assistance claim is based on Attorney Campbell's purported "fail[ure] to investigate or obtain exculpatory mental health records of [L.G.], which [Attorney Campbell] knew to exist and to be exculpatory."  Feb. 1, 2017 Order (Doc. No. 3, at 1-2).

In its order denying Thurlow's motion for a new trial, the Superior Court considered Thurlow's claims that L.G.'s counseling records would have provided Attorney Campbell with evidence concerning: (1) L.G.'s motive to fabricate a story that Thurlow had abused her; (2) Thurlow's lack of opportunity to engage in the conduct underlying his criminal charges; and (3) the possibility that L.G. had based her fabricated charges against Thurlow on pieces of internet fiction referred to as "lemons."  See MNT Order at 14, 16, 18-19 (Doc. No. 1-1, at 25, 27, 29-30).

The Superior Court, in the MNT Order, ruled that Thurlow's right to the effective assistance of counsel was not violated by Attorney Campbell's decision not to obtain and review L.G.'s counseling records.  In so ruling, the court bypassed the performance prong of the Strickland standard and determined that Thurlow had failed to establish that he had been prejudiced by Attorney Campbell's failure to get the counseling records, addressing each of Thurlow's arguments.

A.    Motive to Lie

In its order denying Thurlow's motion for new trial, the Superior Court described the first part of Claim 2 as follows:

> [Thurlow] contends that reviewing counseling records would have revealed that, during a therapy session involving the victim's mother, the victim learned that [Thurlow] had moved back in with her mother. [Thurlow] asserts that this session occurred shortly before the second CAC interview in April 2010, during which the victim first disclosed [Thurlow]'s sexual abuse to law enforcement.  According to [Thurlow], the counseling records would have shown that the victim had a motive to lie in reporting the abuse; specifically, she wanted to move back to New Hampshire with her mother and she was upset that [Thurlow] was living with her mother again.

MNT Order at 14 (Doc. No. 1-1, at 25).

As to L.G.'s motive to lie, the Superior Court ruled that Thurlow was not prejudiced by his attorney's failure to obtain L.G.'s counseling records because those records show that L.G. disclosed Thurlow's conduct to her counselor in June 2009, two

17

months before L.G. learned anything about Thurlow moving back in
with Daigle, the knowledge Thurlow claims gave L.G. a motive to
fabricate sexual abuse allegations against him.  Thurlow's
instant petition fails to demonstrate why the Superior Court's
factual findings are unreasonable in light of the record of this
case.

The Superior Court found that, in light of those facts,
Thurlow was not prejudiced by Attorney Campbell's failure to
obtain L.G.'s counseling records to the extent they revealed the
date that L.G. discovered that Thurlow and Daigle were living
together.  Thurlow fails to demonstrate how the Superior
Court's determination regarding prejudice was an unreasonable
application of Strickland.  Accordingly, Thurlow's Claim 2
fails, to the extent it relies on L.G.'s counseling records
containing a motive to lie.


B.    Lack of Opportunity

In the second part of Claim 2, Thurlow alleges that because
Attorney Campbell did not obtain L.G.'s counseling record, he
was denied the use of a letter written by Daigle, contained
within those records, which Thurlow claims demonstrated Daigle's
near-constant presence in the house where and when L.G. alleged
the sexual assaults took place.  Accordingly, Thurlow argues

18

that he was denied evidence that he lacked the opportunity to
engage in the conduct underlying his sexual assault charges.

At trial, on direct examination, Daigle offered the
following testimony about how much time she spent at home:

> I was home and I tried to be home all the time, as
> much as I could.
>
>         . . . .
>
> I think I was home.  I tried.  The work I did was
> around the kids' schedules, so I did try to be home
> when the little kids or the big kids were off the bus.
> There were days I worked late.  There were times I ran
> a kid, play dates, and picked up, dropped off, after-
> school program I had to pick up once in a while.  But
> most of the time, I was home because I liked being
> home.

Trial Tr. vol. II, 248:23-249:11.  In addition, the following
exchange took place between the prosecutor and Daigle:

> [Prosecutor:]  And would you go out to see
> various friends or any friends?  Any time you could be
> out of the house visiting friends?
>
> [Daigle:]  No.  The most I went out usually was
> to go to the grocery store or go to church.  And most
> of the time, the kids would come with me for church or
> at the Wednesday night youth group stuff.

Id. at 250:5-11.  On cross-examination, Attorney Campbell
elicited further testimony in a similar vein.  See id. at
303:20-307:11.

In its order denying Thurlow's motion for a new trial, the
Superior Court states that Thurlow "argued that the trial
testimony of the victim's mother was different from what she

19

said in the letter about [Thurlow]'s lack of opportunity, and thus the letter would have assisted in impeaching her testimony." MNT Order at 16 (Doc. No. 1-1, at 27).  The Superior Court found, however, that "obtaining the letter in the counseling records would not have changed the outcome of the trial because (1) Attorney Campbell knew this information anyway and (2) the victim's mother testified to the same information contained in the letter." Id. at 18 (Doc. No. 1-1, at 29).

Thurlow does not say, and the court cannot discern, what specific testimony Thurlow sought to impeach with the letter, or how the testimony could have been impeached by that letter, as Daigle's testimony was both favorable to Thurlow's lack-of-opportunity defense and was not inconsistent with what Daigle wrote in the letter.  Thurlow has therefore failed to demonstrate that the Superior Court either unreasonably determined the facts in the record, or unreasonably applied the Strickland standard to find that no prejudice arose from Attorney Campbell's failure to obtain Daigle's letter from L.G.'s counseling records.

C.   "Lemons"

In the MNT Order, the Superior Court described the third part of Claim 2 as follows:

20

> [Thurlow] argues that information contained in the
> counseling records would have allowed the defense to
> "extensive[ly]" cross-examine the victim about her
> interest in sexually explicit fictional stories called
> "lemons."  According to [Thurlow], these lemons "are
> clearly relevant to establish [L.G.'s] knowledge and
> capacity for graphic sexual description, and also
> suggest a curiosity about sexual transgression . . .."
> [Thurlow] also asserts that he could have used the
> "lemon" theme, in conjunction with some of the
> counseling records, to argue to the jury that the
> victim had romantic feelings for him and came up with
> a "lemon" expressing those fantasies, which spun out
> of control and resulted in the sexual abuse charges.

MNT Order at 18-19 (Doc. No. 1-1, at 29-30) (citation to the

record omitted).  The Superior Court ruled that Thurlow was not

prejudiced by his counsel's failure to obtain L.G.'s counseling

records because "Attorney Campbell used the 'lemon' theory to

explain the victim's basis of knowledge, just as [Thurlow]

suggests she should have done [and] [n]othing in [L.G.]'s

counseling records would have assisted trial counsel in further

developing this strategy or using it to greater effect."  Id. at

20 (Doc. No. 1-1, at 31).

The court has reviewed all of L.G.'s counseling records.

There is nothing in those records that Attorney Campbell could

have used to make a more persuasive argument than she did using

the lemon theme.  Thurlow has therefore failed to demonstrate

that the Superior Court either unreasonably determined the facts

in the record or unreasonably applied the Strickland standard to

those facts to find that no prejudice accrued to Thurlow from

Attorney Campbell's failure to obtain the counseling records to obtain further information about "lemons."

IV.  <u>Claim 3</u>

In Claim 3, Thurlow asserts that his Sixth Amendment rights were violated "when the trial court abused its discretion by failing to inquire into [his] timely request to fire his counsel due to irreconcilable differences."  Mar. 22, 2017 Mot. to Amend Pet. (Doc. No. 6), at 3.  Respondent argues that he is entitled to summary judgment on Claim 3 because it has been procedurally defaulted.  Thurlow does not address respondent's procedural default argument.

"[A] federal court may not review federal claims that were procedurally defaulted in state court—that is, claims that the state court denied based on an adequate and independent state procedural rule," Davila v. Davis, 137 S. Ct. 2058, 2064 (2017), if that state procedural rule "is both firmly established and regularly followed."  Logan v. Gelb, 790 F.3d 65, 72 (1st Cir. 2015)).  "A state prisoner may overcome the prohibition on reviewing procedurally defaulted claims if he can show 'cause' to excuse his failure to comply with the state procedural rule and 'actual prejudice resulting from the alleged constitutional violation.'"  Davila, 137 S. Ct. at 2064-65 (quoting Wainwright v. Sykes, 433 U.S. 72, 84 (1977)).

Here, it is undisputed that: (1) in June 2010, Thurlow
filed a motion in which he asked the trial "court to remove and
replace [his] court appointed attorney," MNT Order at 21 (Doc.
No. 1-1, at 32); and (2) the trial court never ruled on that
motion.  However, Thurlow did not raise that issue in his direct
appeal to the NHSC.  He did raise it in his motion for a new
trial, but, in reliance on State v. Kinne, 161 N.H. 41, 44-46, 7
A.3d 1205, 1208-09 (2010), and Avery v. Cunningham, 131 N.H.
138, 143, 551 A.2d 952, 954-55 (1988), the Superior Court ruled
that Thurlow was barred from raising that issue in his motion
for a new trial because he had not raised it in his direct
appeal.  See MNT Order, at 22-23 (Doc. No. 1-1, at 33-34).  The
rule in Avery that bars collateral review of most issues not
raised on direct appeal "is 'firmly established' and 'regularly
followed' in New Hampshire."  Kepple v. Unknown Warden, N. N.H.
Corr. Facility, No. 10-cv-331-LM, 2011 U.S. Dist. LEXIS 110447,
at *33, 2011 WL 4452673, at *12 (D.N.H. Sept. 26, 2011)
(citation omitted).[3]  Thurlow has not addressed the respondent's
procedural-default argument, and therefore has not established
cause and prejudice for his procedural default.  Accordingly,

---

[3]The NHSC has identified certain exceptions to the Avery
rule, but none of them apply here.  See Kinne, 161 N.H. at 45-46
(noting that Avery does not bar collateral attacks asserting
ineffective assistance of counsel or collateral attacks on
purportedly illegal sentences).

Claim 3 has been procedurally defaulted, which entitles the respondent to judgment as a matter of law on that claim.


V.    Certificate of Appealability

The Rules Governing Section 2254 Proceedings ("§ 2254 Rules") require the court to "issue or deny a certificate of appealability ["COA"] when it enters a final order adverse to the party" in a § 2254 action.  § 2254 Rule 11(a).  For the reasons set forth above, the district judge should find that Thurlow has not made a substantial showing of the denial of a constitutional right, and decline to issue a certificate of appealability.  See 28 U.S.C. § 2253(c); § 2254 Rule 11(a).


**Conclusion**

For the reasons described above, the district judge should grant respondent's motion for summary judgment (Doc. No. 24), deny petitioner's motion for summary judgment (Doc. No. 26), and decline to issue a certificate of appealability.[4]  Any objection to this Report and Recommendation must be filed within 14 days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  The

---

[4]Should the district judge accept this recommendation and decline to issue a certificate of appealability, Thurlow may seek such a certificate from the court of appeals under Federal Rule of Appellate Procedure 22(b).  See Rule § 2254 Rule 11; 18 U.S.C. § 2253(c).

14-day period may be extended upon motion.  Failure to file a specific written objection to the Report and Recommendation within the specified time waives the right to appeal the district court's order.  See Santos-Santos v. Torres-Centeno, 842 F.3d 163, 168 (1st Cir. 2016).


                                        _____
                                        Andrea K. Johnstone
                                        United States Magistrate Judge

August 13, 2019

cc:  John P. Newman, Esq.
     Elizabeth C. Woodcock, Esq.